## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **WCI COMMUNITIES, INC.** *et al.*[1] | : | Case No. 08-11643 (KJC) |
| | : | |
| Debtors | : | |

| | | |
|---|---|---|
| | : | |
| **WCI COMMUNITIES, INC.** (f/k/a WCI 2009 Corporation) | : | Adv. Pro. No. 09-52250 (KJC) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **JOSEPH ESPINAL and FABIOLA ESPINAL,** individually and as parents and natural guardians of EMILY ESPINAL and CAMILA ESPINAL, minors, and in their capacity as the representatives of any class | : : : : | |
| Defendants | : | |

## MEMORANDUM AND ORDER

## BY:  KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

On October 2, 2009, WCI Communities, Inc. (the "Plaintiff")[2] filed an adversary

complaint (the "Adversary Complaint") against Joseph and Fabiola Espinal individually, as

parents and natural guardians of Emily and Camila Espinal, and as representatives of an alleged

---

[1]The chapter 11 case filed by WCI Communities, Inc. is jointly administered with over 100 related debtors (the "Debtors") pursuant to the Order dated August 5, 2008 (D.I. #54).

[2]The Plaintiff, WCI Communities, Inc. (f/k/a WCI 2009 Corporation), brings this adversary in its capacity as the disbursing agent under the confirmed chapter 11 plan of reorganization of 2009 Real Estate, LLC (f/k/a 2009 Real Estate Corporation, f/k/a WCI Communities, Inc. ("Old WCI"or "WCI")) and certain of its affiliated entities, including WCI 2009 Corporation.

class of similarly situated individuals (the "Espinals").[3]  (A.D.I. # 1).[4]   The Adversary Complaint

was filed in response to the Espinals' filing of a class action complaint (the "Class Action

Complaint"), against Heron Bay Community Association, Inc., Parkland Golf & Country Club

Foundation, Inc., Venetian Golf & River Club Property Owners Association, Inc., Pelican

Preserve Community Association, Inc., Rimini Property Owners' Association, Inc., The Landings

at Waterlefe Property Owners Association, Inc., The Sound at Waterlefe Condominium

Association, Inc., and Toscana II at Renaissance Condominium Association, Inc. (collectively,

the "WCI Associations").   The Espinals filed the Class Action Complaint on July 27, 2009, in the

Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida (the "State Court"),

Case No. 09041473 (the "State Court Action").

The Adversary Complaint has three counts seeking:  (1) to hold the Espinals in civil

contempt for violating the Confirmation Order;[5] (2) a declaratory judgment that (i) the Plan

discharged certain claims and liabilities raised in the Class Action Complaint, and (ii)  the

Espinals are violating the Plan and Confirmation Order by pursuing those certain claims against

the WCI Associations through the State Court Action; and (3) damages resulting from the

Espinals' breach of contract (i.e., a breach of the Plan, which the Plaintiff argues is a contract

---

[3]No class has been certified in this adversary proceeding or in the State Court Action.  (A.D.I. # 23, 51:20-21).

[4]References to the docket of the main bankruptcy case are "D.I. # __".  References to the docket of this adversary proceeding are "A.D.I. # __".

[5]The *Second Amended Joint Chapter 11 Plan of Reorganization for WCI Communities, Inc. and its Affiliated Debtors* (the "Plan") was filed July 17, 2009 (D.I. # 2088), confirmed by the *Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization for WCI Communities, Inc. and its Affiliated Debtors* dated August 26, 2009 (D.I. #2363) (the "Confirmation Order"), and became effective September 3, 2009 (the "Effective Date").

between the Debtors and their creditors).

On April 14, 2010, the Espinals moved to dismiss the Adversary Complaint pursuant to Rule 12(b)(6) (the "Motion to Dismiss") (A.D.I. # 8).  The Plaintiff filed its opposition to the Motion to Dismiss on April 28, 2010 (A.D.I. # 10).  On January 12, 2011, Espinals filed a *Notice of Completion of Briefing and Request for Oral Argument* (A.D.I. # 11).  Later, in the wake of *Stern v. Marshall*,[6] the Espinals filed a citation to subsequent authorities (A.D.I. # 18), and the Plaintiff responded shortly thereafter (A.D.I. # 21).  This Court heard oral argument on October 13, 2011.  The matter is ripe for decision.  For the reasons given below, the Espinals' Motion to Dismiss the Complaint will be denied.

FACTS[7]

The Bankruptcy Case

The Debtors constructed homes and operated residential leisure-oriented communities and, on August 4, 2008, filed voluntary petitions in this Court for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*). The WCI Associations are incorporated non-profit homeowner associations and, while the WCI Associations did not file bankruptcy petitions and are not parties to this adversary proceeding, they are controlled by the Debtors to benefit the Debtors' residential communities in Florida.

On August 19, 2008, claims agent Epiq Bankruptcy Solutions, LLC (the "Claims Agent") served the Espinals with the notice of commencement of the chapter 11 proceedings. On December 12, 2008, the Claims Agent served the Espinals with notice of the deadline by which

---

[6]*Stern v. Marshall*, __ U.S. __, 131 S.Ct. 2594, 180 L.Ed.2d 475 (June 23, 2011).

[7]The material facts set forth are not disputed.

3

claims must be filed (February 2, 2009). On May 29, 2009, the Espinals' attorney filed a proof

of claim against Old WCI on their behalf (the "Espinal Claim"), alleging claims for "personal

injury, property damage and other claims" related to defective drywall imported from China and

used in their home (the "Chinese Drywall").[8] Many other homeowners in the communities also

filed proofs of claim against the Debtors relating to alleged personal injuries and property

damage caused by the Chinese Drywall used by the Debtors in numerous Florida homes[9].

The Debtors filed the Plan on July 17, 2009. As a result of protracted and contentious

negotiations, the Debtors' Plan created a Chinese Drywall Trust (the "Chinese Drywall Trust") to

liquidate, resolve, pay and satisfy the Chinese Drywall Claims pursuant to certain claims

liquidation procedures.[10] The Chinese Drywall Trust also has sole authority to pursue Insurance

Coverage Actions and Insurance Recoveries (as those terms are defined in the Plan).

The Plan also included certain releases and injunctions, including the following:

---

[8]The Espinals and others were given leave to file a late proof of claim by Order dated May 11, 2009 (D.I. 1589), granting the Motion of Florida Chinese Drywall Plaintiffs For Entry of an Order Allowing Late Filed Claims (D.I. 1548).

[9]The Plaintiff contends that hundreds of proofs of claim related to the Chinese Drywall were filed in the Debtors' bankruptcy cases, including over 250 claimants who requested the right to file late Chinese Drywall proofs of claim. The proofs of claim and pre-petition class action lawsuits allege that the defective Chinese Drywall emits various sulfide gases and/or other chemicals that cause damage to home structures, mechanical systems, and various personal property, including appliances, jewelry and other household items. Certain claimants have also alleged that the Chinese Drywall may cause health problems, such as respiratory problems, sinus problems, eye irritations, and nose bleeds. *Second Amended Disclosure Statement Related to the Second Amended Joint Chapter 11 Plan of Reorganization for WCI Communities, Inc. and its Affiliated Debtors*, filed July 17, 2009, p. 51 (D.I. 2089).

[10]A Chinese Drywall Claim is defined in the Plan as a "Claim asserted against a **Debtor by** an owner or occupant of, or other Person otherwise exposed to a home built by a Debtor for damages related to Chinese Drywall." (Plan, Ex. A, 23) (emphasis added). A "Debtor" is defined as "any of WCI and its direct and indirect subsidiaries **that are debtors** in the Chapter 11 Cases, including those parties listed on Exhibit 'B' to the Plan." (Plan, Ex. A, 46) (emphasis added).

(1)    Section 8.15 entitled "Releases by Creditors and Equity and Security Holders," and

(2)    Section 18.23 entitled "Injunctions," which includes a general injunction (the "General Injunction") and an injunction related to the Chinese Drywall Claims (the "Chinese Drywall Injunction).[11]

On July 17, 2009, in the main bankruptcy case, I entered the *Order (I) approving the Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization for WCI Communities, Inc. And Its Affiliated Debtors; (II) Approving Form of Ballots and Proposed Solicitation and Tabulation Procedures for the Plan; (III) Approving the Solicitation Packages and Prescribing the Form and Manner of Notice of Distribution Thereof; (IV) Establishing Procedures for (A) Voting in Connection with the Plan Confirmation Process and (B) Temporary Allowance of Claims Related Thereto; and (V) Scheduling a Hearing on Plan Confirmation.* (D.I. # 2097) (the "Solicitation Order"). The Solicitation Order approved the forms of ballots, including the one used for voting by Class 5 - Chinese Drywall Claims, which had an "Opt-out Election" providing a procedure to opt-out of granting the Release set forth in Section 8.15 of the Plan. The procedure to opt-out is explained clearly on the Class 5 Ballot:

> **Item 3.  Opt-Out Election.** Check this box if you elect <u>not</u> to grant the releases contained in Section 8.15 of the Plan as they relate to the opt-out release parties set forth in Section 8.15 of the Plan.  Election to withhold consent is at your option.  If you submit your Ballot without this box checked, you will be deemed to consent to the releases set forth in Section 8.15 of the Plan to the fullest extent permitted by applicable law.  The full text of Section 8.15 of the Plan is set forth at the end of this Ballot.

> ☐    The undersigned elects <u>not</u> to grant the releases contained in Section 8.15 of the Plan.

---

[11]The texts of the General Injunction and the Chinese Drywall Injunction are set forth in the Discussion, below. *See* Section B.2 (General Injunction) and Section B.3 (Chinese Drywall Injunction).

(D.I. # 2097, Ex. B4, Item 3) (emphasis in original).

On July 24, 2009, the Claims Agent served the Espinals with a solicitation package, which included a ballot to vote to accept or reject the Plan. The Espinals did not object to confirmation of the proposed plan, return the ballot, or opt-out of the Release.[12]

I confirmed the Plan on August 26, 2009. The Confirmation Order includes two injunction provisions that mirror the General Injunction and the Chinese Drywall Injunction found in the Plan.[13] On September 4, 2009, the Claims Agent served *Notice of Entry of Order Confirming Second Amended Joint Chapter 11 Plan of Reorganization for WCI Communities, Inc. and its Affiliated Debtors*, and *Notice of Occurrence of [September 3, 2009] Effective Date* on the Espinals.

The State Court Action

The Espinals filed the State Court Action on July 27, 2009. After the Confirmation Order was entered on August 26, 2009, the Espinals served the WCI Associations with the Class Action Complaint on August 28, 2009. The Class Action Complaint seeks damages from the WCI Associations based upon drywall effects in the Espinals' home. The Class Action Complaint contends that, since the WCI Associations are non-debtors under the Plan, claims against the WCI Associations are not "Chinese Drywall Claims" prohibited by the Chinese Drywall Injunction. The Class Action Complaint alleges that the WCI Associations breached fiduciary duties and were negligent to homeowners in failing to inform the homeowners of the use and

---

[12] The Plaintiff alleges that 97.8% of the Chinese Drywall Claimants voted to accept the Plan.

[13] The Confirmation Order contains provisions that essentially duplicate the General Injunction (¶69) and the Chinese Drywall Injunction (¶70).

dangers of the Chinese Drywall.

On September 9, 2009, the Plaintiff's counsel sent a letter to the Espinals, asserting that pursuit of the State Court Action violated the Plan, Confirmation Order, and Bankruptcy Code. Plaintiff's counsel demanded that the Espinals withdraw their Class Action Complaint by September 21, 2009, failing which it would commence this adversary proceeding. Espinals did not withdraw their Class Action Complaint and the Plaintiff then brought the present adversary proceeding.

## DISCUSSION[14]

### A.    Standard for a Rule 12(b)(6) Motion to Dismiss

The standard employed to evaluate a motion to dismiss is a familiar one. Fed.R.Civ.P. 12(b)(6), made applicable by Fed.R.Bankr.P. 7012(b), governs a motion to dismiss for failing to state a claim upon which relief can be granted. "The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case." *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Anti-Trust Litig.)*, 496 F.Supp. 2d 404, 407 (D.Del. 2007) citing *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

---

[14]This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a). The matter before me is "core" pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(A) and (L). Paragraph 62 of the Confirmation Order provides that "[p]ursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Court shall retain and shall have exclusive jurisdiction over any matter: (a) arising under the Bankruptcy Code; (b) arising in or related to the Cases or the Plan; or (c) that relates to the matters set forth in Article XVII of the Plan. Additionally, it is axiomatic that, as here, when "a matter affects the interpretation, implementation . . . or administration of a confirmed plan . . . retention of post-confirmation bankruptcy court jurisdiction is normally appropriate." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 168-69 (3d Cir. 2004). The parties offered supplemental submissions after the United States Supreme Court's decision in *Stern v. Marshall*, 546 U.S. ___, 131 S. Ct. 2594 (2011). The Espinals argue that *Stern* requires that the "State Law" claims raised in the State Court Action be transferred to the Article III district court or to the State Court. The underlying merits of the claims made in the State Court Action are not before me; therefore, *Stern v. Marshall* does not pose a challenge to this Court's jurisdiction.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S.544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).  When considering a motion to dismiss for failure to state a claim, the court should conduct a two-part analysis:

> First, the factual and legal elements of a claim should be separated.  The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, the [court] must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts. . . . This "plausibility" determination will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations and punctuation omitted).

The relevant record under consideration consists of the complaint and any "document integral or explicitly relied on in the complaint."  *U.S. Express Lines, Ltd. v. Higgins,* 281 F.3d 383, 388 (3d Cir. 2002), citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997).  The movant carries the burden of demonstrating that dismissal is appropriate. *Intel Corp.*, 496 F.Supp.2d at 408.

**B.**     **The Plaintiff's Interpretation of the Plan and Confirmation Order is Plausible**

Viability of the Complaint's three counts depends on whether the Plaintiff's interpretation of various provisions in the Plan and the Confirmation Order is plausible.  Specifically, the Plaintiff must show that it is plausible that either the Release or the Injunctions in the Plan and Confirmation Order prevent the Espinals from bringing the State Court Action against the WCI

8

Associations.

    1.    <u>The Release Plausibly Prohibits the State Court Action</u>

Section 8.15 of the Plan includes a section titled "Releases by Creditors and Equity

Security Holders." That section provides in relevant part:

> Subject to the occurrence of the Effective Date, any holder of a Claim that is
> impaired or unimpaired under the Plan . . . will be presumed conclusively to have
> released the Debtors, the New WCI Group, their ***non-Debtor affiliates*** and each
> of their ***respective present and former officers and directors***, their respective
> successors, assigns . . . and any ***Person claimed to be liable derivately [sic]***
> through any of the foregoing, from any Cause of Action based on the same subject
> matter as such Claim . . . <u>except</u> that nothing in the Plan shall . . . impair the rights
> of the Chinese Drywall Trust . . . or any Chinese Drywall Action . . . . <u>except,
> further,</u> that nothing in this Section shall be construed to release any party from
> willful misconduct or gross negligence as determined by a Final Order; <u>except,
> further,</u> that the foregoing releases shall not apply to any holder of a Claim . . . if
> such holder "opts out" of the releases provided in this Section by a timely written
> election.

(Plan, § 8.15) (underlining in original, emphasis added) (the "Release").

The Plan provides that any "holder of a Claim" releases "the Debtors, the New WCI

Group, their non-Debtor affiliates and each of their respective present and former officers and

directors" from "any Cause of Action based on the same subject matter as such Claim." The

Plan defines a "Claim" broadly, tracking the definition used in the Bankruptcy Code. 11 U.S.C.

§ 101(5).[15] The Espinals do not dispute that they are holders of Claims relating to Chinese

---

[15]The Plan defines a "Claim" as "(a) any right to payment, whether or not such right is known or
unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,
disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for
breach of performance if such breach gives rise to a right of payment, whether or not such right to an
equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured,
disputed, undisputed, secured, or unsecured. For avoidance of doubt, 'Claim' includes, without
limitation, a right to payment, or equitable relief that gives rise to a right to payment, that has or has not
accrued under non-bankruptcy law that is created by one or more acts or omissions of the Debtors if: (a)
the act(s) or omission(s) occurred before or at the time of the Effective Date; (b) the act(s) or omission(s)
may be sufficient to establish liability when injuries/damages are manifested; and (c) at the time of the

Drywall. Therefore, the Espinals' current claims in the State Court Action relating to Chinese

Drywall are based on the same subject matter as the Chinese Drywall Claims discussed in the

Plan.

(a)    Use of Lowercase "a" in "affiliates"

The Espinals argue that, as a matter of law, the WCI Associations are not released by

virtue of the Plan because they are not "affiliates" or "Affiliates."[16]    The Espinals point out that

the Plan did not define "affiliate," with a lowercase "a," ("lowercase affiliate") in the Glossary.

The Espinals argue that the lack of an explicit definition precludes the Release from applying to

the WCI Associations because the WCI Associations "are not specifically identified as a 'non-

Debtor affiliate' anywhere within the plan, [so] they do not qualify as a non-Debtor affiliate for

purposes of the Release." (A.D.I. # 8 at 14).

This logic is unavailing, especially at the 12(b)(6) stage.  By this logic, the releases of

"present and former officers and directors, their respective successor [and] assigns . . ." would

not constitute valid releases unless each director was specifically identified somewhere within

the plan.  The Plaintiff cites persuasive case law addressing the enforceability of a release that

describes categories of released parties, rather than specific parties.  Interpreting New York's

General Obligations Law § 15-108, the Court of Appeals of New York held:

> Neither the Delaware statute (10 Del. Code Annot. § 6304(a)) nor
> the New York statute (General Obligations Law § 15-108(a)) says

---

Effective Date, the Debtors have received one or more demands for payment for injuries or damages
arising from such acts or omissions."

[16]In addition to arguing that the WCI Associations are released, the Plaintiff argues that those
individuals who allegedly breached fiduciary duties and acted negligently also may be released
independently under the Plan as "respective present and former officers."

> in so many words that a release must specifically name or identify
> the persons to be discharged; the Legislatures could easily have so
> provided if that was their intention. We conclude that such
> specificity is not required. As with contracts generally, the courts
> must look to the language of a release -- the words used by the
> parties -- to determine their intent, resorting to extrinsic evidence
> only when the court concludes as a matter of law that the contract
> is ambiguous.

*Wells v. Shearson Lehman/American Express*, 72 N.Y.2d 11, 19 (1988).[17]

Moreover, decisional law cited by the Espinals does not support their position that the

Release is ineffective due to its failure to identify the released parties and its "general vagueness

and ambiguities."[18]  (A.D.I. 8 at 13).  The Espinals cite three cases, which they assert stand for

the following propositions: (1) a release given by one party to a second party does not release a

claim that the releasor had against a third party, even when there is an assignment;[19] (2) a release

must be made knowingly and voluntarily;[20]  and (3) a release "is strictly construed against the

party asserting it and must spell out with the utmost particularity the intention of the parties.[21]

(*See* A.D.I.8, at 13-14).  None of the cases cited support the Espinals' Motion to Dismiss.

---

[17]The Plan provides that the laws of the State of New York govern. (Plan, § 18.11).

[18]If the Espinals, who were and are represented by counsel, thought the release was too vague or ambiguous with its use of lowercase affiliates or Uppercase Affiliates, they should - - and could - - have opted out.

[19]*Medtronic Ave, Inc. v. Advanced Cardiovascular Systems*, 247 F.3d 44, 58 (3rd Cir. 2001).  In *Medtronic*, two companies (Company A and Company B) entered into a settlement agreement that included a release and covenant not to sue. A third company (Company C) purchased Company's B's business and, thereafter, filed litigation against Company A.  Company A asserted that Company C was bound by the release and covenant not to sue. Company C argued that its claims against Company A were unrelated to its purchase of Company B and outside the scope of the settlement agreement. The Court agreed. *Id.*, 247 F.3d at 56-58.

[20]*Tomaskovic v. Hoffman-LA Roche, Inc.*, 485 F.3d 770 (3d Cir. 2007).

[21]*Galligan v. Arovitch*, 421 Pa. 301, 303 (1966).

11

First, the Plaintiff argues that the Espinals directly released the "non-Debtor affiliates" through the Plan and, therefore, this matter does not involve a release assigned to a third party. Second, at this stage, the Espinals cannot argue that they did not knowingly and voluntarily release the WCI Associations due to the Plan's failure to identify the "non-Debtor affiliates." The Espinals' Class Action Complaint alleges that the WCI Associations were "at all times material hereto controlled by the developer [WCI] and its affiliates" and that "most, if not all of the directors, officers and board members of the Defendant WCI [Associations] have been executives of WCI and have been appointed by WCI or its affiliates." Class Action Compl., ¶11. Therefore, it is plausible (arguably, conclusive, based upon the allegations in the Class Action Complaint) that the Espinals were aware that the WCI Associations were affiliates of the Debtors who would fall within the Release's "non-Debtor affiliate" language. Finally, the Espinals provide no support for the proposition that failing to name the WCI Associations specifically evidences the parties' intention to exclude the WCI Associations, especially at the Rule 12(b)(6) stage. Therefore, each of the three propositions asserted by the Espinals fails to support their legal conclusion.

(b)    Use of Uppercase Affiliate as Defined Term

The Espinals also argue that if the Debtors intended to refer to the defined term, Uppercase "Affiliates," in the Release, it still would not cover the WCI Associations. "'Affiliate' as defined in the Glossary of the Plan means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, *if such Person was a debtor in a case under the Bankruptcy Code*." (Plan, Ex. A, at 8) (emphasis added). The Espinals argue that the WCI Associations fall outside the definition of "Affiliate"

12

because they are not debtors in a case under the Bankruptcy Code and, therefore, the Release does not apply to them.

However, the Release refers to *non-Debtor* affiliates.[22] Even assuming that the word "affiliate" was intended to be capitalized, the Plaintiff still has a plausible argument that the Release applies to *non-debtor* Affiliates, including the WCI Associations.

(c)    The Release is Plausibly Enforceable

The Espinals argue that even if the Release applied to the WCI Associations as "non-Debtor affiliates," the Release as written is unenforceable. The Espinals argue that the Release fails to meet the standard in this Circuit governing non-consensual non-debtor releases in plans of reorganization. *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 211 (3d Cir. 2000) (deciding that the hallmarks for permissible non-consensual releases include fairness, necessity to the reorganization and specific factual findings to support these conclusions).

Here, the Espinals had a choice about whether to grant the release. The approved form of ballot for Class 5 included an opt-out provision for Chinese Drywall claimants such as the Espinals. They had merely to check a box and thereby <u>not</u> grant the Release found in the Plan.

---

[22]The Bankruptcy Code's definition of "affiliate" is not restricted to debtor entities. Bankruptcy Code §101(2) provides, in pertinent part:

(2)    The term "affiliate" means - -

    (A)    entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, [with some exceptions] . . .

    (B)    corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor [with some exceptions] . . . .

11 U.S.C. §101(2)(A) and (B).

By choosing not to return a ballot, the Espinals chose not to opt-out. They were deemed to consent to the Release in the Plan.[23]  The Espinals did not raise an objection to the form of ballot prior to entry of the Solicitation Order nor did they raise an objection to any release prior to confirmation.  I cannot conclude at this stage that the Release is unenforceable.[24]  *See In re Vencor, Inc.*, 284 B.R. 79 (Bankr.D.Del. 2002) (The Court denied a motion to set aside a third-party release contained in a confirmation order when the motion was filed one year after the confirmation order was entered).

    2.    <u>The General Injunction</u>

The Espinals argue that the General Injunction does not apply to the Class Action Complaint as a matter of law. The General Injunction provides that:

> On the Effective Date and <u>except</u> as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against . . . the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the New WCI Group or its Affiliates, **the Debtors or their Affiliates**, the Estates, the Assets, or the Disbursing Agent, or any of their current or former respective members, directors, managers, officers, employees, agents and professionals, successors and assigns or their respective assets and property with respect to such Claims . . . (other than actions brought to enforce any rights or obligations under the Plan):
>     (a) commencing, conducting, or continuing in any manner, **directly or indirectly**, any suit, action or other proceeding of any kind (<u>including</u>, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

---

[23]To my knowledge there are no class members who opted-out presently before the Court.  The putative class representatives failed to opt-out.

[24] The Espinals also raise numerous arguments against the Release that should have been raised as confirmation issues.  For example, they argue that the consideration given in exchange for the Release was inadequate and that the Release is too broad.  These objections are untimely.

(Plan, § 18.23).  The General Injunction uses the Uppercase "Affiliates," which is defined in the Plan Glossary to refer to non-debtors.[25]  However, the Plaintiff also asserts that the Class Action Complaint is a direct, or at least indirect, suit against the Debtors, their Affiliates, or employees. It is plausible that the State Court Action is an indirect suit against the officers or employees of WCI, who also served as directors, officers, or board members of the WCI Associations.[26]  Thus, based on the allegations in the Class Action Complaint and the Adversary Complaint, it is plausible that the General Injunction prohibits the Espinals from bringing the claims asserted in State Court Action.

       3.     <u>The Chinese Drywall Injunction</u>

The Injunction Provision in the Plan also includes language related to the Chinese Drywall Claims as follows:

> Further, on the Effective Date, pursuant to section 105(a) of the Bankruptcy Code, all Persons shall be permanently and forever stayed, restrained and enjoined from taking any of the following actions against or affecting the New WCI Group or its Affiliates, the Debtors or their Affiliates . . . or any of their current or former respective . . . directors . . . for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Chinese Drywall Claims . . . including . . . (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind.

(Plan, § 18.23).

The Espinals argue that the claims against the WCI Associations do not fall within the

---

[25]As stated previously, "Affiliate" is defined in the Plan Glossary to mean,  with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, *if such Person was a debtor in a case under the Bankruptcy Code*." (Plan, Ex. A, at 8) (emphasis added).

[26]In the Class Action Complaint, the Espinals allege that most if not all of the directors, officers and board members of the WCI Associations have been executives of WCI. (Class Action Compl,, ¶ 11).

Plan's definition of "Chinese Drywall Claims" because WCI Associations are not Debtors. (*See* n. 10, *supra.*). However, under the terms of the Solicitation Order, the Debtors were authorized to enter into stipulated settlements for the treatment of claims for voting purposes in lieu of the filing by a creditor of a motion for temporary allowance of a claim. Consequently, the Debtors entered into such a stipulation with the Espinals and others, all characterized as holding "Chinese Drywall Claims." (D.I. 2242) (the "Voting Stipulation"). The Voting Stipulation provided, in part, that the Espinal Claim was temporarily allowed in the amount of $500,000 - - solely for the purpose of voting on the Plan as a Class 5 Claim. Therefore, the Plaintiff's interpretation of the Chinese Drywall Injunction as a bar to the Class Action Complaint claims against the WCI Associations is plausible.

## C.    The Counts

Because the Plaintiff's interpretation of the Release and General Injunction are reasonable, the three counts in the Adversary Complaint set forth plausible claims for relief.

1.    Count One: Civil Contempt

Section 105 of the Bankruptcy Code provides that the Court may take any action or make any determination necessary or appropriate to enforce or implement court orders. (11 U.S.C. § 105(a)). "[A]ll courts have inherent contempt powers to enforce compliance with their lawful orders and no specific statute is required to give a court that civil contempt power. . . . It would be anomalous that this court should not have the power to enforce obedience . . . by civil contempt." *In re Kennedy*, 80 B.R. 673 (Bankr. D. Del. 1987).

"The confirmation order and discharge injunction are critical elements of the fresh start

that is afforded to debtors." *In re Continental Airlines, Inc.*, 236 B.R. 318, 330 (Bankr. D. Del.

1999) (citing *Miller v. Mayer (In re Miller)*, 81 B.R. 669, 672 (Bankr.M.D.Fla. 1998)). It is

essential that an order regarding the complex give-and-take of bankruptcy negotiations be

enforced, and that the debtors and third-parties enjoy the rights and protections ordered by the

Court.

The Plaintiff seeks money damages as a result of Espinals' alleged civil contempt. To

obtain sanctions, the Plaintiff must show (1) a valid court order; (2) Espinals' knowledge of the

order; and (3) that Espinals disobeyed the order. *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d

Cir. 1995). The Plaintiff has properly alleged that (1) this Court's August 26, 2009 Confirmation

Order exists; (2) that Espinals knew of the Plan and the Confirmation Order, and (3) that, as

discussed above, it is plausible that the Espinals' disobeyed the Confirmation Order and violated

the confirmed Plan. Although the Espinals dispute these facts, the Plaintiff has alleged them

properly and Count One sets forth a plausible claim for relief.

2.    Count Two: Declaratory Judgment

The Plaintiff seeks a declaratory judgment that commencing or continuing the State Court

Action violates the Release, discharge, and Injunctions of the Plan and the Confirmation Order,

pursuant to 28 U.S.C. § 2201.[27] The Plaintiff seeks declarations that: (a) the State Court Action

and any liability of the "Debtor, the WCI Associations and the WCI Executives therefor [sic]

were discharged by the Plan, the Confirmation Order, and the Bankruptcy Code; and (b) Espinals

_____

[27]Pursuant to 28 U.S.C. § 2201(a), "any court of the United States, upon the filing of an
appropriate pleading, may declare the rights and other legal relations of any interested party seeking such
declaration, whether or not further relief is or could be sought. Any such declaration shall have the force
and effect of a final judgment or decree and shall be reviewable as such."

. . . violated the Plan, the Confirmation Order, and the Bankruptcy Code by continuing the State Court Action and circulation of the Solicitation Letter in order to indirectly collect discharged claims against WCI and the WCI Executives."[28]  (Compl., ¶ 96).  For the reasons discussed above, Count Two sets forth a plausible claim for relief.


       3.       <u>Count Three: Breach of Contract</u>

The Plaintiff alleges that the Espinals breached the Plan and the Confirmation Order by continuing the State Court Action.  Again, the underlying issues include the scope and effect of the Release and General Injunction provisions of the Plan and the Confirmation Order.  For the reasons discussed above , Count Three sets forth a plausible claim for relief.

---

[28]The Class Action Complaint brings express allegations only against the WCI Associations, not the WCI Executives or the Debtor.

18

CONCLUSION

For the reasons set forth above, it is **ORDERED** that the Motion to Dismiss is **DENIED**.

It is further **ORDERED** that a status hearing shall be held on **June 18, 2012 at 11 a.m.** in

Courtroom No. 5, of the United States Bankruptcy Court for the District of Delaware, 824

Market Street, Wilmington, DE 19804.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: June 1, 2012

cc: Eric M. Sutty, Esquire[29]

---

[29]Counsel shall serve a copy of this Memorandum and Order upon all interested parties and file a
Certificate of Service with the Court.

19